THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAIG A. HOWARD ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 08 C 4812 |
| ) | |
| v. ) | Magistrate Judge Arlander Keys |
| ) | |
| ) | |
| TIN, INC., d/b/a ) | |
| TEMPLE-INLAND, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

On January 16, 2007, Temple-Inland ("TIN") fired Craig
Howard from his job as Shipping Facilitator in TIN's Northlake,
Illinois plant. At the time, Mr Howard, who was then 56 years
old, had worked for the company for more than 34 years. After
pursuing the required administrative remedies, Mr. Howard sued
TIN, claiming that it fired him because of his age, in violation
of the Age Discrimination in Employment Act. TIN denies that age
had anything to do with its decision to fire Mr. Howard and
claims that the firing was based solely on his poor job
performance. The case is currently before the Court on TIN's
Motion for Summary Judgment, which, for the reasons explained
herein, is granted.

## Factual Background & Procedural History

In 1973,[1] Craig Howard started working for Temple-Inland, a
manufacturing company focused on corrugated packaging and
building products, with cardboard packaging plants nationwide;
born March 22, 1951, he was 22 at the time.  In 1998, he began
working as the manager of the shipping department at Temple-
Inland's Northlake, Illinois box plant; his title was Shipping
Facilitator, sometimes referred to as Shipping Manager.  He was
fired from that job on January 16, 2007, when he was just two
months shy of his 56th birthday.

At least in his last years on the job, Mr Howard's
performance reviews were just ok.  In his 2004 review, prepared
by his supervisor at the time, Dan Bulich, on February 11 2005,
Mr. Howard was rated in some areas as having met his employer's
acceptable standards, and he was rated in other areas as having
fallen short of that mark; according to his supervisor, he did
not exceed expectations in any area, though he did exceed his
goals and objectives in the area of safety.  *See* Defendant's
Appendix, Exhibit 6.  His 2005 review, which was prepared by his
supervisor at the time, Arturo Arroyo, on January 16, 2006, was
no better: again, Mr Howard was rated in some areas as having met
acceptable standards, and he was rated in other areas as having

---

[1]Mr. Howard actually started with the company in 1969, working
part-time on his school breaks; he became a full-time employee in
1973.

2

fallen below that threshold; he did not received a single rating in the "exceeds expectations" category, nor did he exceed, or even meet, any of his goals and objectives. *See* Defendant's Appendix, Exhibit 7.

On October 24, 2006, Mr. Howard received an "Action Plan Notice Relating to Unsatisfactory Performance." *See* Defendant's Appendix, Exhibit 8. The Notice was prepared by Shane Morin, who had been hired by TIN just a couple of months earlier to serve as the "area manager" in charge of TIN's Northlake and Carol Stream, Illinois plants. *See* Morin Dep., pp. 8-9. The October 24, 2006 Action Plan Notice served "as a formal notice of [Howard's] unsatisfactory performance" and detailed Howard's deficiencies; the notice indicated that management had previously met with Mr. Howard "regarding violation of [TIN's] cash to order procedures as well as on 6/23/06 & 7/14/06 to formally document your poor job performance in these areas lack of Inventory cycle counts, Poor WO [work order] closure, Units shipped missing load-tags, and Poor overall shipping supervision." Defendant's Appendix, Exhibit 8, p. 000389. Mr. Morin wrote:

> The leadership of your department still is not being met by company standards as has been outlined and discussed with you on a regular basis. Over the last month you have made very little impact in the department and I have serious concern about your job performance and ability to lead.

*Id.* The Notice indicated that, unless Howard's performance improved by December 1, 2006, he risked losing his job.

3

Specifically, the Notice stated, in bold, that "[a]ll objectives detailed below must be met in the near future. Please clearly understand that failure to meet and sustain the objectives will subject you to termination of employment from Temple-Inland." *Id.* The Notice went on to list expectations in four areas, safety, procedures, quality and miscellaneous; Mr. Howard signed the notice, indicating his agreement that he understood the details, results, and objectives as outlined in the above Action Plan, and that you agree improvement in your performance is needed and necessary to continue employment as a converting supervisor with Temple-Inland." *Id.*, p. 000388.

The parties disagree about what happened after the Notice was issued. According to Mr. Howard, his performance improved to some extent and his immediate supervisor, Dave Geiger, told him so. According to TIN, nothing really changed and Mr. Howard's performance did not improve. From TIN's perspective, the situation came to a head on January 12, 2007, when an incident occurred in the shipping department, on Mr. Howard's watch, where two employees took simultaneous breaks, effectively shutting down production and costing the company thousands of dollars. Mr. Howard admits that the January 12th incident occurred, but he does not believe that this had anything to do with the decision to fire him.

In either case, Mr. Morin fired Mr. Howard on January 16,

4

2007. A memo from Mr. Morin to Mr. Howard that date indicates that Mr. Howard's performance did not improve in the wake of the October 24, 2006 meeting and that "the events of Friday January 12, 2007 along with continued inventory management issues, scanning issues, on-time delivery issues and prolonged substandard performance of your department have led me to the conclusion that we must immediately remove you from the Shipping Manager position and terminate your employment with Temple-Inland." Defendant's Appendix, Exhibit 10. Mr. Howard claims that, when Mr. Morin fired him, he told him that he had two Shipping Facilitators, and he only needed one, so he was letting Mr. Howard go. Mr. Howard concedes that, at that termination meeting, Mr. Morin discussed Mr. Howard's performance issues; he also concedes that Mr. Morin never mentioned age.

After being fired, Mr. Howard filed a charge with the Illinois Department of Human Rights and the EEOC, which issued a right-to-sue letter on July 31, 2008. The next month, on August 22, 2008, Mr. Howard filed suit in federal court, alleging that TIN fired him because of his age in violation of the Age Discrimination in Employment Act. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on September 24, 2008. The case is currently before the Court on TIN's motion for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56.

## Discussion

Summary judgment will be granted where the pleadings and supporting documents show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P 56(c); *Lewis v. City of Chicago et al*, 496 F.3d 645, 650 (7th Cir. 2007). Whether a fact is material to the dispute is established by the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue as to one of these material facts exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

In a summary judgment proceeding, the Court will disregard all facts not properly supported by the record. *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). Additionally, at this juncture, it is not the role of the Court to make "credibility determinations nor choose between competing inferences." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993); *See also Paz v. Wauconda Healthcare and Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006). However, in determining whether a genuine issue of material fact exists, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999). The moving party initially bears the burden

6

of showing that no genuine issue of material fact exists in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1985).

On the other hand, if the moving party meets its burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial, and the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading ...." *Anderson*, 477 U.S. at 257.

Mr. Howard has sued for age discrimination under the Age Discrimination in Employment Act, which makes it unlawful for an employer to fire any employee who is 40 years old or older "because of such individual's age." 29 U.S.C. §623(a)(1). A plaintiff may establish discrimination in violation of the ADEA either by putting forth direct evidence of discrimination or by following the indirect method spelled out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Mr. Howard has indicated that he believes he may proceed under either approach.

Turning first to the direct method, Mr. Howard argues that a statement made by Stephen Folan, TIN's vice president, constitutes direct evidence of discrimination. "A statement can be 'direct evidence of discriminatory intent where the statement was made around the time of *and* in reference to the adverse employment action.'" *Berger v. The Art Institute of Chicago*, No. 08 C 4023, 2009 WL 3462495, at *9 (N.D. Ill. Oct. 21, 2009)(quoting *Olson v. Northern FS, Inc.*, 387 F.3d 632, 635 (7th

Cir. 2004). That is not the case here.

At his deposition, Dan Bulich, who served as the manufacturing coordinator at the Northlake plant and who left TIN in October 2006, testified that he once heard Steve Folan say to Shane Morin "he's a dinosaur." See Deposition of Dan Bulich, pp. 51-52. Mr. Bulich could not pinpoint exactly when Mr. Folan made this statement. Worse yet for Mr. Howard's case, Mr. Bulich testified that he never heard anyone mention Mr. Howard's name and that he simply assumed Mr. Folan was talking about Mr. Howard. Id., pp. 51-52, 82. He offered nothing to explain his assumption. Because of this, Mr. Bulich's testimony about the statement is not enough to establish that it had anything to do with Mr. Howard or with TIN's decision to fire Mr. Howard. Thus, although it may be relevant under the indirect approach, this statement does not satisfy the direct evidence standard.

Because Mr. Howard cannot prove his claim with direct evidence, he must proceed under the indirect method outlined in McDonnell Douglas. To make out a prima facie case of discrimination in the termination context, a plaintiff must establish that (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he was discharged; and (4) the employer either filled the position with a person not in the plaintiff's protected class or that a similarly-situated individual outside the protected class was

8

treated more favorably. *Berger*, 2009 WL 3462495, at \*9 (citing *Jennings v. Illinois Department of Corrections*, 496 F.3d 764, 767 (7th Cir. 2007); *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845-46 (7th Cir. 2007)). The plaintiff must provide sufficient evidence that establishes, by a preponderance of the evidence, each element of a *prima facie* case. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081,1088 (7th Cir. 2000).

If a plaintiff makes out a *prima facie* case of discrimination, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision." *Berger*, 2009 WL 3462495, at \*9 (quoting *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 724 (7th Cir. 2005)). "If the employer does articulate such a reason, then 'the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination.'" *Id.* at 900-01. "Throughout this burden-shifting, the ultimate burden of persuasion remains at all times with the plaintiff." *Rudin*, 420 F.3d at 724 (citing *Moser v. Indiana Department of Corrections*, 406 F.3d 895, 901 (7th Cir. 2005)).

Here, TIN argues that Mr. Howard cannot make out a *prima facie* case because he cannot show that he was meeting his employer's expectations and because he cannot show that any younger, similarly situated employees were treated better. Nor, TIN argues, can Mr. Howard show that its stated reason for firing

him – namely, his poor performance – was a pretext for age discrimination.

Turning first to the question of whether Howard was meeting his employer's expectations, the Court agrees that he cannot show that he was; on the contrary, the evidence overwhelmingly supports TIN's position on this issue. To begin with, the documentary evidence shows that Mr Howard's supervisors consistently gave him ratings that fell below the "meeting acceptable standards" threshold. For his performance review dated February 11, 2005, Mr. Howard received a rating of 3 (on the spectrum included on the form, this was below the "meets acceptable standards" threshold and significantly below the "greatly exceeds acceptable standards" threshold) in the category of "continuous improvement," where Mr. Bulich noted that "many obsticals [sic] in shipping. Find ways to remove roadblocks." See Defendant's Appendix, Exhibit 6, p. TIN 0163, He also received a 3 in the area of "quality focus" and in the area of "development of employees," where Mr. Bulich noted that Mr Howard "need[s] more interaction + cross training with stock box." *Id.*, p. TIN 0162. Mr. Bulich also noted in the review that, although Mr. Howard has a "very good understanding of plant production flow," he needs a "better understanding of JDE System to be able to run a full month end inventory." *Id.* Finally, the review indicates that Mr. Howard had not met his goals and objectives

with regard to waste. *Id.*

Similarly, Mr. Howard's January 16, 2006 performance review shows that he was rated at below the "meets acceptable standards" threshold in the "interpersonal relations" category and in all categories of the "leadership dimensions" section. *See* Defendant's Appendix, Exhibit 7, pp. TIN 0161, TIN 0164. On this review, Mr. Howard's supervisor, Arturo Arroyo, also noted that Mr. Howard "needs to get much more involved in the up keep of shipping, i.e., overruns, dead loads, aging product." *Id.*, p. TIN 0164. In the general comments section, Mr. Arroyo noted that, although Mr. Howard "knows the shipping process very well, he needs to find ways to get everyone to buy in to what we want to accomplish"; he also noted that Mr. Howard needed to "train another back up" and "do a better job in controlling finished goods inventory, promote safety every day." *Id.* The review indicates that Mr. Howard did not meet his goals and objectives with regard to safety or environmental quality. *Id.*

Similarly, the October 24, 2006 Action Plan Notice indicates various areas where Mr. Howard's performance was deficient. According to that memo, Mr. Howard violated the company's "cash to order procedures" and exhibited "poor job performance" in meeting the company's standards concerning inventory cycle counts, work order closures, load tags on shipped units and overall shipping supervision. *See* Defendant's Appendix, Exhibit

8, p. 000389. In the notice, Shane Morin, TIN's area manager and Mr. Howard's then supervisor, indicated that "[t]he leadership of your department still is not being met by company standards as has been outlined and discussed with you on a regular basis. Over the last month you have made very little impact in the department and I have serious concern about your job performance and ability to lead." *Id.* The plan spelled out objectives and specifically stated that Howard was required to meet them within the specified timeframe (October 27, 2006 through December 1, 2006), and that failure to meet and sustain the objectives "will subject you to termination of employment from Temple-Inland." *Id.* Mr. Howard signed the form, thereby indicating that he understood "the details, results and objectives as outlined in the above Action Plan," and that he "agree[d] improvement in your performance is needed and necessary to continue employment as converting supervisor with Temple-Inland." *Id.*, p. 000388.

The deposition testimony also shows that Mr. Howard's performance fell short of meeting his employer's expectations. Stephen Folan, who was promoted from district manager to regional vice president in November 2006, testified that, in his view, Mr. Howard was "inconsistent" – he had to keep on him because of all the problems and had to oversee his operations with a level of scrutiny and supervision that was beyond what he ordinarily employed. *See* Folan Dep., pp. 93-96. Mr. Folan testified that

12

TIN had a lot of problems relating to the Nestle account; he testified that Nestle (one of TIN's biggest customers) complained that the shipping trailers were so dirty that the boxes coming out of them could not be used to hold food products, a problem that, in his view, fell within Mr. Howard's area of responsibility. Mr. Folan testified that, unlike most managers, Mr. Howard didn't take care of the problem himself, but had to be held accountable and had to be required to send pictures of the trailers each day to prove that he was staying on top of the issue. Mr. Folan testified that Mr. Howard was placed on a performance review under Mr. Morin, under Mr. Wolfe and then again under Mr. Morin. Folan Dep., p. 96. He testified that the same problems kept recurring in Mr. Howard's department, and that he had to address the same issues on more than one occasion. Folan Dep., 59-60.

Dan Bulich, who served as the "superintendent" at the Northlake plant, initially testified that Mr. Howard met his performance expectations when he worked for him. Bulich Dep., p. 14; he also testified initially that he did not generally recall that Mr. Howard had any issues with his performance. Bulich Dep., pp. 27-29. But Mr. Bulich also testified that, for Mr. Howard's February 2005 performance review, he rated him at "below" meeting standards in at least two areas ("continuous improvement" and "quality focus"). Bulich Dep., pp. 72-73. Mr.

13

Bulich also acknowledged that, on the February 2005 review, he specifically noted that Mr Howard "needs a better understanding of the JDE system," Bulich Dep., pp. 72-73, and he also noted that, to be an effective leader, Mr. Howard needed to make some changes and improve in certain areas. *Id.*, p. 30. Specifically, he testified that Mr. Howard needed to do a better job of holding his employees accountable. Bulich Dep., p. 65. Further, with respect to Mr. Howard's performance, Mr. Bulich testified that there were "times where a unit was shipped and it wasn't billed out." Bulich Dep., p. 35. And he acknowledged that, in his capacity as plant superintendent, he spoke with Mr. Howard about his work performance and about him needing to hold his employees accountable. Bulich Dep., pp. 70-71.

Dave Geiger, who worked for TIN from 1986 through November 2006, first as plant production manager in Northlake, then as plant manager in Northlake and ultimately as the operations manager in Northlake, is probably the most complimentary of Mr. Howard's performance. But even he acknowledged that Mr. Howard had performance issues. Mr. Geiger testified that, overall, Mr. Howard "did a pretty decent job," Geiger Dep., pp. 106, 111, and he testified that everyone at the plant had performance issues, not just Mr. Howard. Yet Mr. Geiger also testified that the Northlake plant was "kind of chaotic" and "kind of a mess" and that he was brought in to turn things around; he testified that

14

the plant wasn't running well, had high waste, poor housekeeping, poor safety record, poor efficiencies." Geiger Dep., p. 9. He admitted that "[s]hipping really wasn't my main concern when I first got there. I can tell you that I spent very little time in that area." Geiger Dep., p. 45. Yet, he knew enough to know that "[t]here would have been conversations about Craig's performance back there as far as housekeeping and those types of things." Geiger Dep., p. 46. And, despite his initial neutral or complimentary assessment of Mr. Howard's performance, Mr. Geiger testified that, when he arrived back at Northlake, "there was some older, obsolete inventory that had been sitting there that hadn't moved" and that "there was definitely aged inventory back there." Geiger Dep., p 88. Ultimately, Mr. Geiger testified that Mr. Howard "had some performance issues, sure, as they all did." Geiger Dep., p. 111.

Shane Morin testified that Mr. Howard's performance was poor and that he felt compelled to issue the Action Plan Notice in October of 2006; he also testified that, despite the notice, Mr Howard's performance did not improve. Morin Dep., p. 124. Mr. Morin testified that he issued the Action Plan Notice with the expectation that Mr Howard would step up, improve his performance, rectify the problems his department was having and save his job. But that didn't happen. Mr. Morin testified that his goal in issuing the performance improvement plan was to help

make Mr. Howard a successful employee; he testified that there had been a lot of turnover in the plant and that he was trying to limit the amount of turnover. Morin Dep., p. 89. But he testified that, throughout the evaluation period, "we still felt the performance was – was not getting done on multiple fronts." Morin Dep., pp. 93-94. Mr. Morin testified that Nestle downsized TIN because of problems with the shipping department, and, in his view, there wasn't a whole lot of improvement in that area, at least with respect to that account. *Id.*, pp. 94-95. Mr. Morin testified that

> we had been concerned about his performance on a multitude of fronts, which was documented – or the department's performance I guess, which he was responsible for directly with him. And we weren't seeing the improvement. Customers such as Nestle were still upset. Billing of lading errors, inventory accuracy, cycle count procedures, bill of lading procedures, inventory adjustments. So through all of that, we were trying to see if Craig could improve performance, but the – his department continued to get more and more agitated and the employees that worked for him continued to get more and more frustrated. And there was a specific event on the – on the 12th where he didn't, in my mind, handle correctly at all, and it caused the company a lot of money and lost productivity and customer issues. And I just had to terminate at that point.

Morin Dep., p. 96.

Mr. Morin's view that Mr. Howard failed to improve during the evaluation period is consistent with the testimony of Richard Christopher, who ran the show at TIN's St. Louis plant and came to Northlake to help resolve some of the problems that plant was

experiencing; according to Mr. Christopher, Mr. Howard pretty much refused to implement any of the recommendations he made concerning efficiency of operations. Christopher Dep., p. 100. In fact, Mr. Howard admitted that, although Mr. Christopher's report identified areas of concern in the shipping department (including overrun problems) and recommended changes to be made to improve operations and efficiency, he did not recall implementing any of those changes. Howard Dep., pp. 89, 91-92, 169.

Significantly, Mr Howard acknowledges that his performance was subpar in several areas. He signed both his February 11, 2005 and his January 15, 2006 performance reviews without comment, which certainly suggests that he recognized the deficiencies noted therein, and he did the same with respect to the October 24, 2006 Action Plan Notice. With regard to his 2005 performance review, Mr. Howard acknowledged that, in three areas, he was rated at "below meets acceptable standards" – those areas were continuous improvement, quality focus and development of employees. Howard Dep., p. 83. He also acknowledged that the rating for development of employees related to his failure to adequately cross train employees in both the stock box and the shipping departments. *Id.*, p. 84. Mr. Howard testified that he did not necessarily agree with Mr. Bulich's rating. *Id.* Yet he also testified that he thought Mr. Bulich was a "positive guy, an

honest person," Howard Dep., pp. 80-81; and he testified that Mr. Bulich was familiar with the quality of his work at TIN. Howard Dep., pp. 81-82. He also testified that, to his knowledge, Bulich was not out to get him and was not otherwise biased against him. Howard Dep., p. 82.

With regard to the performance review prepared by Arturo Arroyo in January 2006, Mr. Howard acknowledged that he was rated at below meets acceptable standards in the area of continuous improvement, and he acknowledged receiving the Action Plan Notice relating to unsatisfactory performance in October of 2006. Howard Dep., p. 120. Mr. Howard testified that, based upon the notice, he understood that, if his performance did not improve, he could be fired. *Id.*, p. 127. He testified that, at the time he received the action plan notice, he agreed that "some of my performances needed to improve," Howard Dep., p. 128, and he agreed that, by providing the notice, Shane Morin and TIN management were giving him a chance to improve his performance, to clean up his act. Howard Dep., p. 129. Mr. Howard testified that, after he received the action plan notice, he met weekly with Dave Geiger to discuss the issues raised; he testified that he felt that he was making improvement in the areas referenced in the plan and that Dave Geiger also mentioned his improvements in a meeting. *Id.*, p. 136. But Mr. Howard also admitted that he did not achieve all of the goals set in the action plan. *Id.*, p.

18

Mr. Howard acknowledged that he received a negative rating regarding waste in 2005, and he admitted that, although the entire plant had a waste problem, he was responsible for the small amounts of waste produced in the shipping department. Howard Dep., p. 85. And he admitted that, at least during the time when Richard Christopher was working with Northlake at the end of 2006, the shipping department was experiencing "your typical problems that you have running on a day-to-day basis"; they were also having a "major problem" with their scanning guns and their computers because they weren't working properly" and excessive inventories, complaints about bills of lading (the bill didn't correspond to what was on the truck). Howard Dep., pp. 93-94. Mr. Howard testified that, as shipping manager, it was his responsibility to make sure bills of lading were correct. *Id.*, p. 95. Mr. Howard testified that having properly reconciled inventory was one of his jobs as shipping manager, and that, as shipping manager, he was responsible for cleaning up inventory adjustments, reconciling the inventory so that it was proper. Howard Dep., pp. 113-114. In fact, Mr. Howard testified that some of the problems in the shipping department were his fault. *Id.*, p. 98. Mr. Howard admitted that, as shipping manager, it would have been his responsibility to fix work order closure

problems, and that if those problems did not get fixed, it would have been his fault. Howard Dep., pp. 133-136. He also agreed that it was important to keep work orders clean daily, and he testified that he had difficulty doing so. *Id.*, pp. 181-182.

To be sure, Mr. Howard failed to meet his employer's expectations on January 12, 2006, when he allowed two of his employees to take their breaks simultaneously, thereby effectively shutting down the production line. The January 16, 2007 termination memo from Shane Morin references the October Action Plan Notice and states that "the events of Friday January 12, 2007 along with continued inventory management issues, scanning issues, on-time delivery issues and prolonged and sub-standard performance of your department have led me to the conclusion that we must immediately remove you from the Shipping Manager position and terminate your employment with Temple-Inland." Defendant's Appendix, Exhibit 10, p. TIN 0160. All of the witnesses who were asked about the January 12, 2007 incident – including Mr. Howard - agree that it was Mr. Howard's responsibility to ensure that his employees followed break policies, and everyone agrees that the responsibility for this snafu and the resulting work stoppage ultimately rests with Mr Howard. Mr. Howard admitted that he was responsible for staggering his employees' breaks. Howard Dep., p. 143. He argues, however, that it was his policy to let his employees take

their breaks "at their leisure," and that Shane Morin knew that this was his policy; therefore, he argues, it was unfair for Mr. Morin to blame him for the work stoppage. But, given that he was the manager of the department, it would not seem to be unreasonable for TIN to hold him accountable for what his employees did, even if he did not specifically direct his employees to take their breaks at the same time.

Based upon all of the documentary evidence and testimony detailed above, the Court is persuaded that no reasonable jury could find that Mr Howard was meeting his employer's legitimate business expectations.

TIN next argues that Howard is unable to show that younger, similarly-situated employees were treated better. This is a much closer call. The "burden of establishing a *prima facie* case of disparate treatment is not onerous"; it requires a plaintiff to show that he was discharged under circumstances which give rise to an inference of unlawful discrimination." *Berger*, 2009 WL 3462495, at *9 (quoting *Texas Department of Commercial Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Because the facts vary from case to case, the standard is flexible. But "evidence of similarly-situated individuals is an essential element of the *prima facie* case, and, without it, defendant is entitled to judgment as a matter of law on a plaintiff's discrimination claim." *Id.* (citing *Kriescher v. Fox Hills Golf Resort &*

21

*Conference Center*, 384 F.3d 912, 915 (7th Cir. 2004)).

Certainly, some of the evidence Mr. Howard relies on would seem to contradict his position; for example, he cites Jason Bridwell as one such younger individual who was treated better; yet, Mr. Bridwell, who received performance review ratings showing that he was meeting his employer's acceptable standards and whose review does not show a single rating below this threshold, cannot be characterized as being similarly situated to Mr. Howard, whose reviews did contain such ratings. *See* Plaintiff's Rule 56(a)(1) Statement of Additional Material Facts, Exhibit L.

The one fact weighing in Mr. Howard's favor here is the fact that Rodney Watson, who replaced Mr. Howard as the day shift Shipping Facilitator, was 43 at the time. Although he would have been in the protected category himself, the fact that he was 14 years younger than Mr. Howard is significant for purposes of Mr. Howard's case. *See Berger*, at *10 (citing *Tubergan v. St Vincent Hospital and health Care Center, Inc.*, 517 F.3d 470 n.4 (7th Cir 2008)("Under the ADEA, in the case of younger employees that fall above the age of forthy, the age difference must be ten years or greater in order to be presumptively substantial.").

Having said that, even if the Court determined that Mr. Howard had met his burden on this issue, given the Court's ruling concerning Mr. Howard's inability to show that he was meeting

TIN's legitimate business expectations, Mr. Howard's claim would still fail. And the pretext issue merely confirms that conclusion.

TIN argues that, even if Mr. Howard could make out a *prima facie* case, he cannot show that its legitimate, nondiscriminatory reason for firing him ·· namely, his poor performance ·· was a pretext for age discrimination. The Court agrees. The evidence that TIN fired Mr. Howard because of his performance is abundant. Shane Morin testified that it was his decision to issue the first EAP in October 2006 and it was his decision to fire Mr. Howard. *See* Morin Dep., p. 124. He testified that Mr. Howard's performance simply did not improve during the relevant time period; he testified that age had nothing to do with the decision. *Id.*, p. 124. Richard Christopher confirms that Mr. Howard did not implement the suggestions for improvement he provided concerning practices, Christopher Dep., p. 100, and Mr. Howard admits that nothing really changed, despite Christopher's report and recommendations, Howard Dep., pp. 91-92. Mr. Howard himself admits that, when the October 24, 2006 Action Plan Notice was issued "some of my performance needed to improve," Howard Dep., p. 128, and he admitted that he did not achieve all of the goals set in the Action Plan. Howard Dep., p. 140.

The consensus was that, during Mr. Howard's tenure as shipping facilitator or shipping manager, the shipping department

was not operating smoothly or efficiently. David Geiger testified that the Northlake plant "[j]ust wasn't running well, high waste, poor housekeeping, poor safety record, poor efficiencies. I mean across the board it was pretty much in a mess." Geiger Dep., p. 9. He testified that he was brought in as the operations manager at the Northlake plant to help "fix the place"; the plant was kind of chaotic, kind of a mess, so he was brought in to help turn it around. *Id.*, p. 9. Given Mr. Howard's position, TIN held him accountable for those deficiencies. Although reasonable minds may be able to debate whether it was fair for TIN to hold Mr. Howard accountable for those failings (especially given his long employment history), there is no question that, even if the firing was unfair, it had nothing to do with age discrimination. And courts do not get involved when a personnel decision is unfair or when a company's enforcement of its policies is unfair, unless a case can be made that the unfairness stems from discrimination. Here, that is not the case.

There is virtually no evidence to suggest that TIN's firing of Mr. Howard had anything to do with age. Mr. Howard pretty much hangs his hat on the dinosaur comment made by Stephen Folan. But the only person to have heard that comment – Dan Bulich – testified that he *assumed* the comment was directed to Mr. Howard. That is not enough to defeat summary judgment.

Perhaps most significantly, Mr. Howard himself testified that he had no reason to think that Dan Bulich or Shane Morin (or anyone else at TIN) was out to get him because of his age. Mr. Howard testified that Shane Morin fired him on January 16, 2007; he testified that, when he did so, Mr. Morin told him that he had two shipping facilitators and that he only needed one, so he was letting Mr. Howard go. Howard Dep., pp. 143-44. Mr. Morin denies this. But even if he did say this, there is nothing to show that his decision to let Mr. Howard go was based on age. When pressed, Mr. Howard admitted that performance issues did come up at the January 16th meeting. Howard Dep., p. 145. And he admitted that he could have done a better job as shipping manager. *Id.,* p. 147. Obviously, TIN agreed.

When pressed to support his allegations of age discrimination, Mr. Howard testified that he thought, after the fact, well "maybe they [TIN] wanted me to go down the road performance wise badly so that they were going to sweep in with new blood." Howard Dep., p. 163. But there isn't a shred of evidence to support this hypothesis. He testified that, connecting everything, it "comes to my mind, well, maybe they didn't want me there anymore." *Id.,* p. 163. And that may indeed have been the case. But not wanting him there any more is not illegal; it's only illegal if it's linked to his age, and there is no evidence that it was.

25

Additionally, this notion is seriously undermined by TIN's hiring of Adriana Robles - which, by Mr. Howard's own admission, TIN did to help him out in shipping and which, again by his own admission, in fact helped him out. If they had been setting him up to fail - something he testified he did not believe was happening - the company would not have hired her. And this notion is undermined by Shane Morin's testimony, by Stephen Folan's testimony and by Mr. Howard's testimony that the Action Plan Notice was issued with a desire to help him improve and succeed.

Mr. Howard testified that he believed TIN was bringing in a bunch of non-commissioned former military officers - one of whom was Rodney Watson, who replaced him as shipping manager. Howard Dep., pp. 156-158. But Rodney Watson testified that he had no expectation that he was being brought in to replace Howard; indeed, he testified that he was never told that that was the case. And, again, there is nothing illegal about such a move -- unless it is based on age discrimination (and there's no evidence that it was).

Mr. Howard also testified that, at one point, a TIN manager said that the Northlake plant was going to "go forward" and that they were going to try to make things work and that, in the end, some of the current employees might not be around. Howard Dep., pp. 158-59. But there is no evidence that this comment had

anything to do with age, and there is no evidence that the comment was made by Shane Morin or anyone else who may have played a role in the decision to fire Mr. Howard.

As evidence that he was discriminated on the basis of his age, Mr. Howard also testified that TIN gave him a lot of added responsibilities and did not include him on the best practices decisions included in Mr. Christopher's report. Howard Dep., p. 159. He also testified that he would bring up issues and they were ignored. *Id.*, pp. 161-62. But he also testified that he understood why he was given the additional stock box department responsibilities and he testified that he did not ascribe any underhanded motives to that change, Howard Dep., pp. 61-62; he also testified that, when he complained that he needed help, TIN hired Adrianna Robles to help him. *Id.*, p. 88.

Mr. Howard argues that he was meeting TIN's performance expectations, but his own deposition testimony establishes the opposite. He may have had excuses for his poor performance - legitimate or otherwise, but the fact is (and the evidence shows) that he was consistently rated at below meeting expectations. Accordingly, the Court finds that Mr. Howard has failed to meet his burden with regard to pretext.

## **Conclusion**

For the reasons explained more fully above, the Court finds that Mr. Howard has failed to make out a *prima facie* case of age

discrimination against TIN; nor has he demonstrated that TIN's stated reason for firing him – namely, poor performance – was a pretext for age discrimination. Accordingly, the Court finds that summary judgment in TIN's favor is appropriate. TIN's motion for summary judgment [#44] is granted.

Date: December 14, 2009

ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge

28